Case number 20-1469 Jamal Cameron et al. versus Michael Bouchard et al. Argument not to exceed 15 minutes per side. Mr. Clark you may proceed for the appellant. Robert Clark on behalf of the defendant appellant, Oakland County. Just as a formality I've reserved five minutes for rebuttal. That's fine. Emphasizing the significance of federalism and comedy during the recent pandemic Chief State officials undertake to act in areas fraught with medical and scientific uncertainties. Their latitude must be especially broad. Additionally well precedent well-established precedent has uniformly held that district courts do not sit to sit to supervise state prisons. But that is exactly what occurred in this case when the district court denied Oakland County's motion to dismiss plaintiff's habeas claims and entered an expansive preliminary injunction involving 22 separate enumerated paragraphs. To be sure there have never been any inmates in Oakland County jail that have been hospitalized due to COVID-19. Similarly there have not been any inmates who have died due to the virus. In fact less than 1.5% of the total inmate population was positive for COVID-19 at the time the preliminary injunction was entered. The district court's failure to adhere to federalism and comedy principles is first shown by the court's determination regarding plaintiff's habeas claim. It is plaintiff's burden to show that they have exhausted state remedies prior to filing suit. A failure to exhaust state remedies is a bar to such a claim. Exhaustion includes appeals to the state appellate courts including the highest appellate court which in this case would be the Michigan Supreme Court. Indeed the very case law that's cited by plaintiff in the response brief of Sullivan indicates that all that must exist is a process where state courts have provided the requested relief in the past. And here the overwhelming and undisputed evidence shows that Oakland County state court judges have not only considered but granted the same relief requested by plaintiffs during the pandemic. For example, Plaintiffs say that they don't have to exhaust under 2241 because these are exceptional circumstances and that's what the district court found. Um so I'm wondering whether you um what you would say about exceptional circumstances and and if you can give me any examples of what might count as an exceptional circumstance. Yes your honor an exceptional circumstance is not um not present here because um as noted by Judge Bush in the motion to stay the district courts and circuit courts turnaround of these motions has been exceptionally quick. In People v. Webb the 52nd uh third district court granted a motion for release by a convicted inmate one day after the motion was filed. In People v. Doyle the Oakland County circuit court granted a convicted inmate's motion to amend the sentence two days after the defendant filed the motion. The same was true for a pretrial detainee in People v. Moss where the circuit court granted a motion two days after a pretrial detainee filed a motion to amend bond. Um and so in my opinion uh exceptional circumstances may exist if this is a situation where uh one the courts were closed due to the pandemic but Oakland County state courts have routinely um handled such motions and promptly. Or two even if they were open they were taking significant time uh periods of time to rule on such motions but the categorical evidence uh establishes that that is not the case here and in fact these motions are probably being handled much more quickly than normal motions are handled by Michigan state courts. For example a normal motion filed in Oakland County circuit court you have to wait a week for that motion to be heard. In these cases these courts are handling this on an emergency basis. This is further demonstrated by the Michigan Supreme Court which in People v. Chandler vacated courts order denying a motion to modify bail. So what these cases are establishing are that not only are state state remedies available but these are not exceptional cases which even the highest level of Michigan courts are recognizing and issuing prompt and quick decisions and despite that availability plaintiff has not even attempted to exhaust their claims which which should serve as a bar. I think it is interesting it's it's worth noting that plaintiff has never attempted to file a motion and it took a significant period of time or even their motion was denied. They're just the only claim here is uh criticism or critique or really just speculation about what may happen and what the turnaround may be and for those reasons um the procedural bar for their habeas uh is is at play. Do you concede that any of their claims sound in habeas because at first I thought you took the position that their claims sounded only in 1983 because they were all conditions of confinement claims but now it sounds like you think they do at least some of them sound in habeas and others do not? No I was just I was just going to get to that point um I think the procedural bar uh knocks their claim out regardless if they've sounded habeas or not but I don't think that the claims sounded in habeas. If you look at the substantive allegations uh in the complaint and the declarations even in the testimony all of the allegations in this case uh relate to the conditions of confinement of these individuals incarcerations and conditions of confinement claims are not cognizable in habeas. So when you look at I'm sorry to keep interrupting you but how do you square that with with this court's decision just last week in Wilson versus Williams where the court seemed to for release including other forms of custodial release right parole um that those claims sound in habeas? I I your honor I totally recognize the court's uh order in Wilson and um you know the the facts in Wilson were a little different uh the disease had the virus had run rampant through uh the Elkton prison and the district court's findings was basically that uh nothing that the Elkton prison could do would stop the spread. That is not the case here nor is the is the allegation in light of the objective data where you have less than 1.5 percent of the inmates um positive and if you look at the case only relate to um their their specific and unique conditions of confinement. So while I recognize that um Wilson the Wilson case is is um dealt with the habeas instead of habeas may be cognizable in this case I think you can have a different result but still consistent. The court's preliminary injunction was also improper. Well before you move on uh to that I have a question about the habeas uh aspect of this too and in terms of availability of state remedies the court seemed to speak in terms of uh uh parties plaintiffs petitioners not needing to pursue state remedies that uh need not be exhausted when those remedies are unavailable. So I guess my question is you may reference to these various motions apparently some which may or may not be in the record but is there a standard review process that these inmates can follow? I know there's some reference in the record to inmates having been released because of a jail overcrowding act that exists in Michigan doesn't appear that inmates can pursue that on their own. Some courts apparently have uh released inmates without citing any rule or or state statutes. So what is there a what standard review procedures or process is there available to inmates who want to seek release? Your honor I'll answer that two two prong. I think the analysis by plaintiffs um in interpreting O'Sullivan is too narrow. Like I said before O'Sullivan only indicates that a process must exist where state courts have provided the requested relief in the past and the requested release is released. But I'm just wondering can you answer that question? Yes I can judge. And the second the issue here with the overcrowding act the governor's executive order in Michigan has temporarily suspended all procedures in the jail overcrowding act and part of the jail overcrowding act provides the basis for a defendant to file a motion in ordinary circumstances for release because of overcrowding. And so therefore isn't that when the prison is at 95 percent of jail capacity? Under normal design guide capacity? Your honor under normal circumstances yes but in this case because they have uh suspended because the governor has suspended the standard review process as as recognized and as seen by how Oakland County Courts have handled this defendants are routinely filing motions under that act and obtaining the relief requested by plaintiff. And you made that part of the record? Correct judge. So when you say the governor's order suspended the process you don't mean the governor's order has made the process unavailable you mean the governor's order has suspended the some restrictions on access to the process? Your honor just just the procedural requirements of the jail so it's basically expanding the plaintiffs to proceed their habeas claim in this situation. I want to get to get to the preliminary injunction briefly. The argument is very simple. Wilson is fatal to plaintiff's claim here because all of the substantive measures that were taken in Wilson were taken in this case. Mr. Clark let me interrupt you there. There is a difference in that Wilson was a an eighth amendment case and this one is both eighth amendment and 14th amendment. And there's been some briefing I think from amici regarding whether there's a different standard for deliberate indifference under the 14th amendment versus the eighth amendment. Right. If you could address that whether you think there's a different standard and and if there is does it make any difference in this case? That's a two-part answer judge. First the answer to your question is there a difference? No. If you look at Richko or McCain, McCain dealt with the serious medical needs. I see my time is up. Do you want me to finish my? Yes, yes, yes. Please. So McCain is directly on point here your honor. It dealt with a serious medical needs case which is what we have here. And in the second prong of your question even if this is an objective reasonable test the conduct here meets this and pretrial DNAs do not meet their burden for plenary injunction. The objective data undercuts any allegation in this case. We have less than 1.5 percent three out of 483 inmates were tested positive when you have an entire inmate wide availability of testing. Simply put there is just no evidence that the jail's response was not reasonable due to the significant action taken as required. Thank you Mr. Clark. Your initial time has expired. You've got five minutes rebuttal. Thank you judge. We'll certainly reserve that for you. We'll hear next from Ms. Bennett. Please record Jennifer Bennett for the appellees. And I want to start where Mr. Clark left off with Wilson. But before doing that I just want to note that the only thing at issue in this appeal are the safeguards that the district court ordered the jail to implement under section 1983. So the habeas claims of the medically vulnerable subclass aren't relevant here. They're not an issue on this appeal. So turning to Wilson. In Wilson the district court hadn't held a hearing. Wait I'm sorry. Can you tell me why the habeas claims aren't relevant? I thought the district court said this whole thing sounds in habeas. No your honor. So there are two different kinds of claims. There are 1983 claims on behalf of every inmate in the prison. And that's the basis on which the district court ordered relief. That's most of the parts of the preliminary injunction order are based on section 1983. The only habeas claim is the claim of the medically vulnerable subclass for release. And the only preliminary injunction order that addressed that subclass is the final 8.22. It required the jail to provide a list of these medically vulnerable inmates. And that the jail has already provided that list. So that part of the preliminary injunction order is moot. And what the jail says is that the court subsequently issued orders to provide new lists. But the jail hasn't appealed those subsequent orders. And this court wouldn't have jurisdiction over them anyway. How do you deal with the statements in the preliminary injunction from the district court which to the effect that the court finds that home confinement or early release is the only reasonable response to this unprecedented or deadly pandemic. And also any response other than release or home confinement placement constitutes deliberate indifference. Don't those statements indicate that the court is contemplating releasing prisoners? Your honor they do indicate that the court is contemplating releasing prisoners. But the court has not done so yet. And there is no order on appeal to this court right now that deals with release. The only possible order that the district court gave is that number 22 on its preliminary injunction which again was to provide a list that the jail has already provided. So that's moot. If and when the district court does order release then of course the jail can appeal and then it would be at issue then. But for now any order that this court would issue based on those statements in the opinion would just be an advisory opinion. Are you saying it was an advisory opinion from the district court to make those statements in its order? Your honor those statements were directed towards the district court starting a process to consider alternative to incarceration for the medically vulnerable subclass. And the only part of that process that was part of the preliminary injunction that's been appealed here is again providing the list. And that provision is moot now. And to the extent that that process will later continue that is again a remedial process that this court has held in gross post for example that it doesn't have jurisdiction to consider until it is completed. And so again if and when the district court did order release of course the jail could appeal and that's when these statements would be relevant. But for now there is nothing on appeal to which these statements are relevant. And so back to Wilson. In Wilson the reason it came out the way it did was because the district court hadn't held a hearing. It hadn't resolved any factual disputes between the inmates declarations and the prison's declarations. So on appeal this court took the prison at its word about what measures it was implementing. Because it was implementing those measures that this court held rather it was not deliberately indifferent. This case is the exact opposite of Wilson. So here the district court did hold a hearing and it found the jail's witnesses not to be credible. Their testimony the court held wasn't based on their personal knowledge and it may not even have been based on reality. So unlike in Wilson this court may not simply credit the jail's testimony. The contrary here it has to defer to the district court's findings that the jail was not in fact taking the measures it said it was taking. And if you'll permit me I think it would be useful to go through what the district court found here and compare it to the measures that the Wilson court relied on and also to compare it to the jail's claims that this court relied on in granting its stay very recently. And in doing that I just want to make very clear there's no dispute here that the jail knows what measures are necessary. If there's no dispute the jail doesn't argue that punishing inmates by transferring them to where there's a COVID outbreak or failing to give inmates cleaning supplies or failing to give them. So there's no dispute that that would be unreasonable. But that's not a permissible response to the pandemic. The only dispute... Counsel, one of my problems I have with this case is that I'm not aware of any prior case where prison officials were accused of deliberate indifference when they were undertaking actions that they would be subjecting themselves to the risk along with the prisoner of whatever the risk is. So here we have a situation where prison guards are in contact with the prisoners that they're moving from one jail cell to the other. They're in contact with the prisoners when they're giving them the PPE. They're in contact with the prisoners whenever they're wearing masks or not wearing masks. So I'm having a hard time understanding how it could be plausible that the prison guards have deliberate indifference when under the plaintiff's own theories the prison guards are placing themselves at risk under the same risk as the prisoner. So how could that be deliberate indifference for someone to place themselves in the same position as the prisoner with regard to risk? Your Honor, two answers to that. The first is many of the points in this record are only placing the prisoners at risk, not placing the guards at risk. So for example, the officers in this case, there's substantial evidence that the officer in this case threatened and in fact carried out the threat to transfer prisoners as punishment to units where there is a COVID outbreak. That doesn't subject the officers to any heightened risk. But it is clearly, and the jail does not dispute it, that's deliberately indifferent. It disregards the substantial harm that would be caused by transferring someone to where there is a deadly pandemic. So let me ask you about that testimony regarding the transfer. As I understand it, it was Mr. Cameron who gave that testimony regarding he had been serving in a dining hall and he did not want to perform his duty of serving in the dining hall. And he was told that if he didn't serve, he could be transferred. Is that what the testimony is that supports that finding of the district court regarding threatening to transfer? In fact, there are several inmates who testified about transfer. So Mr. Cameron testified that he, because there was an outbreak in the kitchen, he testified that he requested to serve a different duty, to clean something else. He wasn't trying to not work. He testified that he was trying to switch duties to a safer place and they transferred him to where there was an outbreak. Mr. Lee testified that he was sent to the main jail where there was a COVID outbreak for filing a grievance. Mr. Briggs testified- What was the grievance that Mr. Lee filed? The grievance he filed was about his treatment also as a kitchen worker. So these individuals didn't want to perform their duties as a kitchen worker and their position is that there shouldn't be a prisoner who should be serving meals? Was that their position? Um, their position was they were concerned about the safety in the kitchen. And there are other inmates that have nothing to do with kitchen workers who were also transferred. So for example, Mr. Briggs testified that when he asked an officer for a grievance for him to complain about the lack of medical care, the officer threatened to send him to where there was a COVID outbreak. Mr- Was Mr. Briggs denied any medical care? I believe he was, Your Honor. I believe the record shows that for days he was asking for medical care and he did not receive it. And then the members of his cell, when they finally did get a nurse to come by, just gave everybody Tamiflu, which is a flu medicine, not a COVID treatment. Did he test positive for COVID-19? I believe he did, but I'm not certain about that. I'd have to double check that. And again, the jail doesn't dispute, you know, whatever, however you're going to punish inmates, the jail doesn't dispute that punishing them by transferring them to a place where there is a COVID outbreak is not a reasonable response to the harm. There are many ways to punish inmates. You can't punish them by transferring them to a pandemic. And does the record show there was COVID-19 throughout the prison or just in one, just the main jail? It was unclear to me whether there's COVID-19 in the annex area as well as the main jail. My understanding is there was COVID-19 in the main jail, and then there was one case either in the east annex or in the annex, and that person was transferred to the main jail. So my understanding is that as far as we know, the outbreak was inmates in the main jail, but it's difficult to tell because during the first outbreak that the jail had, it wasn't testing everybody. And by its own admission, 15% of those who did test it came back positive. And now, once the court was observing the jail's testing, it turns out that almost 200 inmates mysteriously refused testing. And so it's impossible to tell, in fact, what is actually- Do you treat those inmates who refuse the testing to be part of the class? Don't you think they may have a different interest than other inmates in that they've refused the testing? No, Your Honor. The whole class has an interest in being protected from the substantial harm caused by COVID-19. And as the Supreme Court held in Farmer, as it held in Helling, the inmates don't need to wait until a risk of harm materializes, until they actually get sick, to be warranted protection under the 14th and 8th Amendment. And so the whole class has an interest in protection. And I want to continue to go back- So it's your contention that a prisoner who's denied, who refused to do the testing, nonetheless would have a claim for deliberate indifference against the prison officials? Yes, Your Honor. And let me go through the reasons why that is, right? Whether or not an inmate refused testing, they're still exposed to a substantial risk of harm from a deadly pandemic. And quickly, I would like to go through the claims that the jail has made on deliberate indifference. So we have trans-prisoner cases, COVID outbreak is. We have the jail concedes that it has empty cells, and yet it's crowding inmates into other cells unnecessarily. And the District Court found that it knows of the CDC guidance for social distancing. That, too, is deliberately indifferent. The jail claims that it is quarantining inmates, but what the District Court found is, in fact, those claims are not true. So, for example, there is substantial testimony, as we've been talking about, about an outbreak amongst inmates who work in the kitchen. And rather than being quarantined, those inmates were forced to serve food to other inmates. That's the opposite of a quarantine. Multiple inmates testified that inmates are moved from cell to cell without consideration of who is symptomatic and who is not. With the exception of the court order inspection, there's lots of testimony that the jail left the doors open between supposedly quarantined blocks and others. Most of the jail's claims are like this. They claim they're doing things that a District Court found that they are not, in fact, doing. So, for example, they claim there's regular cleaning, but the District Court found otherwise. And that finding is not clearly erroneous. Because numerous inmates testified that shared spaces were not being cleaned. Mr. Ray testified that he personally was moved into a cell where there was a supposed COVID outbreak without that cell being cleaned beforehand. The jail says it provides DMQ, this cleaning solution, and it says it's effective against COVID. But the only evidence it cites for that is a label from 2018. And a 2018 label, of course, cannot say that something is effective from COVID before COVID existed. Similarly, several inmates testified that the DMQ was watered down. The District Court found, and several inmates testified, they didn't have rags or anything to use the DMQ with. Every claim is like this. So, the jail claim says it was giving inmates soap, but the District Court found otherwise. The jail said it distributed masks to staff. But again, the District Court found that these masks were only worn for purposes of the court order inspection, and then they stopped. And so, if you look at this list, punishing inmates by transferring them to where there's a COVID outbreak, leaving cells empty while inmates are forced to crowd into other cells, failing to ensure- I have a question about the empty cells. What's in the record about the reasons for why the cells are empty? Your Honor, there's almost nothing in the record about the reasons why the cells are empty. The only thing we have is Captain Childs testifying that people are distributed in cells by classification. There's very little explanation of what that means, and the jail has never claimed that it could not use these empty spaces to properly distribute inmates. Where are the empty cells? Which facility or facilities are the empty cells in? My understanding is that they're distributed, but they're mostly in the main jail, in the annex. But I'm not positive about that, Your Honor. The main jail is the jail with the COVID outbreak, right? So, you'd like to move people from the annex to the main jail where there's more COVID? In the main jail and the annex, there are people crowded together, for example, in 10-person cells when there are empty cells in the same block, right, that could be used. And I believe there's a chart in the record. I will find the site for you for the chart in the record that shows the distribution of the cells there. And, you know, again, I want to stress that the jail does not claim that it would be reasonable to transfer inmates where there's a COVID outbreak, to not give inmates soap, to not sufficiently clean, leave cells empty when others are crowded. The jail doesn't claim that any of these things are reasonable. There's no dispute here. Unlike in Wilson, perhaps, there's no dispute here about what's required. The only dispute is a factual dispute about whether the jail is actually doing what it says it does. And the district court resolves that dispute. And this court has to defer to the district court's resolution of that actual dispute. Can I ask you a question about, so as I'm understanding the way you're framing your claim today, all these claims are conditions of confinement claims. None of these claims are habeas claims. Correct. And so the relief that your clients want is not release? Is that what I'm understanding? There are multiple classes. Wilson says, which is from last week, that if you're seeking release, it sounds in habeas, even if it's custodial release, like parole. I see my time has expired. May I answer that question? You certainly may. So there are two, there are multiple classes in this case. So there's a, there's a class of subclasses that address every inmate in the jail, though they're seeking changes in the conditions of confinement under section 193. And there's a class. So as to that class, the subclass that only wants changes in conditions of confinement, they still need to exhaust their internal remedies, right? They're, they're prison remedies. And I understand that the district court made some factual findings about exhaustion, but also made a legal finding. Like one of the reasons she said that the prison grievance procedure was not available was because release is not available. But if release is not available as a remedy, that's the reason she said it wasn't, you didn't have to exhaust. So I feel like we're talking in circles here. You want, can you straighten me out? I understand your honor. So the district court looked at release both for the medically vulnerable subclass. It looked both at section 1983 and in habeas as a vehicle for that. Wilson makes clear that habeas is the vehicle. And so the PLRA and administrative exhaustion do not apply to the medically vulnerable subclasses. On the, on the, the rest of the inmates as a whole, their claims under section 1983, the main finding that the district court had in respect with those people is that the officers were thwarting inmates efforts to exhaust through machination and intimidation. And there's a huge amount of testimony to support that finding. And then we went through a bit of it earlier. I'd happy to go through more of it. No, no, I understand. I understand there's some other testimony that she doesn't talk about that suggests that many of the prisoners have been able to file internal grievances. But so, so, so, so there's what the jail, the jail says it's received eight grievances. And the question under this court's decision in Himmelreich isn't whether anyone has ever filed a grievance. The question is whether the grievance process is functionally unavailable to a person of ordinary firmness and given substantial testimony about threats for filing grievances, about officers refusing to provide grievance forms, especially specifically with respect to COVID the district court's factual finding that the jail is thwarting inmates through machination and intimidation is not clearly erroneous. And based on that factual finding under Himmelreich, it's legal conclusion that a person of ordinary firmness would be deterred is correct. There are no further questions. Thank you very much. Thank you, Ms. Bennett. Mr. Clark, you have five minutes of rebuttal. Thank you, your honor. I want to touch base or start my rebuttal with the statements made by counsel regarding the conduct or at least the allegations in this case. I reviewed the court's opinion very recently. And if you look at pages 53 to 55, there was no specific findings in the court. More or less alluded to some of the allegations. And it's worth keeping in mind that the allegations were levied in this case, not by testifying witnesses that were subject to cross-examination. These were declarants whose affidavits were procured by counsel. The Chun case that's cited in my reply brief, that case involved 36 declarations that were submitted to this district court with similar allegations, complaining of conditions of confinement. But similar to our case, the Chun case had limited hospitalizations. They had limited positive cases. And the Chun case ultimately denied plaintiff's request for preliminary injunction because it held that the facts were not borne out. The objective data was not borne out by the allegations. That if the allegations were true, there would be significant outbreak. And this is the most important testimony with respect to this issue in our case was presented by a testifying expert on behalf of plaintiff, Dr. Loring. Dr. Loring testified that if a jail is not committing itself to the measures that Oakland County Jail indicated it had in place, the Oakland County Jail would not get lucky. Lucky was Dr. Loring's term. And Dr. Loring said, if these measures not being taken, you're going to see an outbreak, you're going to see spread. That has not occurred in this case. And so you really have to wonder what is going on with these allegations contained in these declarations. If you go by what Dr. Loring says, you're going to see much higher numbers than three out of 483 testing positive. You're going to see much higher than 1.5%. And keep in mind, a preliminary injunction is an extraordinary remedy. The facts in this case just don't bear out that an extraordinary remedy, such as a preliminary injunction when deference is owed to a state prison is warranted. When you look at- I just want to interrupt one second. I hate to, and you can get back into your train of thought. I want to take this, get this habeas thing all wrapped up. You say in your brief a number of times that this order is an unprecedented prisoner release order. Do you concede now that that is not the case, that this is not an order that releases any prisoners? Because the brief seems to clearly represent otherwise. Your Honor, I would say it is an unprecedented order in terms of- Now you said unprecedented prisoner release order. That's my question. Right. I want to know what prisoners have been ordered to be released pursuant to the court order as you have represented. With regard to prison release order, that's coming from the PLRA. The PLRA says a prisoner release order includes a preliminary injunction contemplating release. So that's- Okay. And what prisoners are being contemplated to be released now? The medically vulnerable prisoners on the list that was provided? That was provided, correct. Okay. So- Would there be any other reason? I mean, the district court pretty clearly indicated that the reason she wanted the list of the medically vulnerable was so that she could have that point of the district court. Your Honor, it's part and parcel. It could not be clearer. If there was no release that was going to occur, there would never be a need for a submission of names. Not this is after the injunction was issued, but this is part of the injunction in that court has required submissions of names of these inmates, plans to submit a bail applications. I mean, to sit there and say that a release is not imminent or likely, it could not be more disingenuous. It is certainly contemplated and envisioned by the court. And that's why paragraph 22 of that injunction is contained. My last point, Your Honors, is if you look at the entire course of conduct that occurred here by the jail, including the numerous undisputed measures that have been taken, including the release initiative that the Oakland County Jail was under no obligation to participate in, wherein 110 of 166 inmates were released by state court judges. If you look at the entire course of conduct in this case, you cannot find that there's one deliberate indifference on behalf of the county or that there was an existing unconstitutional policy, which is the only claim in this case. Well, let me ask you about, we were talking about this, these inmates serving food in the kitchen. And as I understand it, the district court credited the testimony of, maybe it was a declaration, I'm not sure what it was, but Jason Arsenault, it wasn't Mr. Cameron, who told, apparently, correct me if I'm wrong, told the deputy he was sick and did not feel comfortable serving food to the other inmates. According to Mr. Arsenault, the guard told him, called him a somewhat foul name and told him to keep on serving. And he claims he was forced to serve until he was bedridden and then physically assaulted by the guard even after that. So what's your response to that? My response is somewhat complex, Judge. And the first thing I need to note is that Mr. Arsenault, similar to many of the allegations in this claim by declarence, never identified the officer by name. It was, I see my time's up. I never identified the officer by name when this occurred, anything like this. And what was going on during this time is prisoners in the East Annex, which is a dormitory styled annex to the main jail, where there is significant freedom and responsibilities for these inmates to be in the East Annex, including food duty. They were trying to get out of performing these responsibilities under the guise of COVID. Whenever their temperatures would be taken or any of the other measures implemented by the jail, it would always be negative. And none of these people in the East Annex were testing positive. In fact, not a single East Annex inmate had tested positive through late April. Okay. But they were still seeing all these complaints for inmates trying to get out of their responsibilities. Okay. So there had to be some order and discipline and potential threat of moving back to the main jail, losing the dormitory style set up. Otherwise nothing was going to get done by these individuals who had committed to a certain set of tasks in order to be in the dormitory style function. And just because you could go back to the main jail, one of your honors referenced it before, the main jail has 163 individual cells. The quarantine cells were maybe a handful. So just because you're going to be in the main jail does not mean you're in an area where there's COVID. COVID has not run rampant in the main jail and there's no finding to the contrary. So to say that you can't transfer or threaten to transfer something to the main jail, it just doesn't line up with how a jail is run. And in terms of Richard Watkins and his testimony, it seems to have claims that he was transferred from a non-COVID unit to either into a COVID unit or immediately adjacent. Could you address that? And then I know it's time to wrap up. Yes, your honor. So the issue of Mr. Watkins is unique. He was in a single cell and there's significant research that you don't want to put somebody in a single cell for too long due to mental health issues that can develop. So Mr. Watkins was not displaying any symptoms. He agreed to a test. And before the test results came back, he was scheduled to move to a cell with other inmates. So he was moved to the cell. At that time, the test came back in the interim and it was learned that he was positive. At that point, that entire cell and the row of cells was quarantined in accordance with policy. So he was not moved to a new area where there was an increased risk or anything like that. And that goes to the deliberate indifference or lack thereof regarding what was known to the jail. Okay. Thank you, Judge. Any further questions? Apparently not. Thank you, Mr. Clark and Ms. Bennett. We appreciate you taking the time this afternoon to participate in this argument by way of video. Thanks to our crack staff in Cincinnati. They managed to pull these off without any real problems. And we appreciate that as well. But we really do appreciate your arguments this afternoon, understand the importance of the issues, you know, all concerned. And with that, you may adjourn court. And we'll take this case under advisement and have a decision for you as expeditiously as we can. So thank you both. Thank you. President, do you want to adjourn court? You may. Yes, this honorable court is now adjourned. And counsel, you may disconnect.